UNITED STATES, Appellee

v

TALMADGE P. GUNNELS, Major, U. S. Air Force, Appellant

8 USCMA 130, 23 CMR 354

131

*Major George M. Wilson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley S. Butt.*

*Major John M. Rankin* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis P. Murray* and *Major Fred C. Vowell.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of a number of violations of the Uniform Code of Military Justice and sentenced him to dismissal, total forfeitures, and confinement at hard labor for one year. Intermediate appellate authorities affirmed. We granted review on the question of whether the accused was deprived of due process of law.

Airman James Hill was an instructor on B–47 aircraft at Amarillo Air Force Base, Texas. The accused was his squadron commander. During his off-duty hours, Hill engaged in civilian employment. As a result, he often fell asleep in his classes and on other occasions failed to report for duty. For a time Hill's noncommissioned officers censured him for these lapses, but eventually they reported him to the accused. After several talks, the accused told Hill that he could get him an honorable discharge for $200 or $300. On a pretext, Hill was given emergency leave to enable him to go home to obtain the money. Succeeding in this purpose, Hill sent $200 to the accused by Western Union. When he returned to the base, however, he was advised by the accused that the matter would take longer to complete than originally contemplated. Shortly thereafter, the accused was relieved as squadron commander and made secretary of the Officers' Open Mess. After his transfer, the plan to obtain a discharge for Hill aborted, and Hill himself was transferred to an air base in Idaho. The accused did not return the $200.

About two months later, charges were preferred against the accused for a false

official statement in connection with his operation of the Open Mess, and these charges were referred for trial by general court-martial. The accused wrote to Hill advising him of his difficulty. For use in his defense, he requested from Hill an affidavit of certain purported facts. The material recitals in the affidavit were false. Nevertheless, Hill sent the statement to the accused. He, in turn, gave it to his lawyer, who prepared a list of questions based upon it. The accused sent this list to Hill, together with suggested answers. On receipt of the list, Hill started to write out the answers, but soon desisted. He went to his commanding officer, and informed him of his dealings with the accused. In the meantime, Hill's affidavit had been shown to the Staff Judge Advocate at the accused's base, and the Officers' Mess charge was "dropped."

Hill's disclosures to his commanding officer were investigated. On May 10, 1955, a charge sheet was prepared, but not signed, which set out the present offenses, except that of making a false official statement, which was added later. The circumstances under which the latter charge arose present the issue in this case.

On May 12, 1955, Agents Skidgel and Thompson of the Amarillo Office of Special Investigations interviewed the accused. They informed him of the pending charges against him and advised him of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. The accused told Agent Skidgel that he desired to make no statement until he "had an opportunity to consult with counsel." Skidgel permitted the accused to go to the office of

the Staff Judge Advocate at the base "with instructions that . . . [he] return immediately thereafter." While the accused was en route, Agent Skidgel called Captain S. W. Martin, Jr., the Assistant Staff Judge Advocate, to inform him of the impending visit. Captain Martin went to Lieutenant King, who was also in the Staff Judge Advocate's office, showed him an Air Force regulation (AFR 110–4), and reminded him that he could not give any legal advice to the accused. Earlier Lt. King and all the other legal officers in the office of the Staff Judge Advocate had been called together in a meeting. The Staff Judge Advocate told them that charges against the accused were being drawn. He also told them that he had not yet determined what assignments he would make in the case, and that until he did, no officer was to give legal advice to, or consult with, the accused. He emphasized that if the "front office gets wind" of any assistance to the accused, "heads will roll." When the accused arrived at the Staff Judge Advocate's office, he went to Lt. King who had represented him in the Officers' Mess case. The lieutenant showed him the Air Force regulation, and told him that he could not "advise" him.

Frustrated in his efforts to obtain legal advice, the accused returned to the office of Agents Skidgel and Thompson. He asked, and was permitted, to read Article 31 for himself. The agents then questioned him. The accused refused to answer many of the questions. He did, however, answer several which constituted a denial that he had received any money from Hill. This denial was charged as a false official statement to Agent Skidgel.

On July 1, 1955, the accused was again called to Agent Skidgel's office. By this time, the charges had been served upon him. Accordingly, he appeared with Lt. King whom he had asked to represent him. When Agent Skidgel saw the lieutenant, he engaged in a "tirade" against him and refused to permit him to be present during the interrogation. When the lieutenant refused to leave, the agent called the Staff Judge Advocate, and the latter indicated that the lieutenant was not entitled to be present. As a result, Lt. King left, and the accused was questioned. He gave no answers.

At the trial the accused moved to dismiss all the charges on the ground that he was deprived of military due process by being denied counsel at the interrogations conducted by the agents. No complaint is made regarding counsel for the preparation of the case, the Article 32 investigation, and the trial.

Under the United States Constitution, in "all criminal prosecutions" the accused is entitled "to have ▉▉▉▉▉ ▉ the Assistance of Counsel for his defense." United States Constitution, Amendment VI. The right is not limited to the trial itself, but includes the pretrial proceedings during which counsel investigates the facts and prepares the defense. The United States Supreme Court has aptly said that the accused "requires the guiding hand of counsel at every step in the proceedings against him." Powell v Alabama, 287 US 45, 69, 53 S Ct 55, 77 L ed 158.

A criminal proceeding, however, must be distinguished from an investigation by a law enforcement agent. ▉▉▉▉▉ ▉ Only in the former instance does the right to assigned counsel exist. Thus, in United States v Moore, 4 USCMA 482, 486, 16 CMR 56, we pointed out that under the Uniform Code an accused is not entitled to "appointed military counsel prior to the filing of charges" against him. The distinction between a criminal proceeding and an investigation does not, however, mean that a person suspected of the commission of a crime can be precluded from consulting counsel. The belief entertained by the Staff Judge Advocate and the investigating officers in this case that such a prohibition exists is wholly wrong. One may not have a right to appointed counsel because no charge has been lodged against him, but he is not thereby precluded from obtaining necessary legal advice. Even in an administrative proceeding, Congress has directed that a "person compelled to appear . . . before any agency or representative thereof shall be accorded the right to be accom-

panied . . . and advised by counsel." 5 USC § 1005(a). We, therefore, strongly condemn the practice, which appears to be common in the military, of telling a suspect that he cannot consult with counsel in connection with an interrogation by enforcement agents. A suspect has no right to the appointment of military counsel, but he most assuredly has a right to consult with a lawyer of his own choice or with the Staff Judge Advocate. Cf. Rule 5(b), Federal Rules of Criminal Procedure. We also condemn, therefore, the Staff Judge Advocate's order to his assistants to refrain from advising the accused if he sought their counsel.

Years ago we marked out the Staff Judge Advocate's duties in regard to the investigation of a case. In United States v DeAngelis, 3 USCMA 298, 305, 12 CMR 54, we said:

"Since a staff judge advocate is the administrator of military justice and discipline, it would be incongruous in the extreme were we to assume that he is unable to function at all unless and until charges have been preferred and investigated. Because of his position and the knowledge of law he possesses, all members of the armed forces consult him when violations of the Articles of War, or the Uniform Code of Military Justice occur. Especially is this true when a crime of unusual magnitude or one involving serious implications is under investigation. It is obvious that the use of his services minimizes the risk of error arising from faulty pretrial investigations, and appreciably reduces the preference of ill-founded charges against those subject to military law."

In any event, even if the Staff Judge Advocate preferred not to become involved in the matter himself, he had no justification for the stern injunction he issued to his assistants, especially Lt. King. The lieutenant had represented the accused in the Officers' Mess proceedings, out of which the present charges arose. In view of his attorney-client relationship with the accused, Lt. King was automatically excluded from consideration as trial counsel. See United States v McCluskey, 6 USCMA 545, 20 CMR 261. His lack of certification by The Judge Advocate General of the Air Force precluded his appointment as a law officer. Article 26(a), Uniform Code of Military Justice, 10 USC § 826.[1] Therefore, he, at least, was available to assist the accused, regardless of the Staff Judge Advocate's indecision as to the appointments for the trial of the case.

Moreover, the provisions of Air Force Regulation 110–4 do not conflict with the duty of the Staff Judge Advocate during the investigative stage of an alleged violation of the Uniform Code. The regulation merely defines the functions of a legal assistance officer. Those duties are separate and apart from the responsibilities of the Staff Judge Advocate. The legal assistance officer acts as attorney for his client while the Staff Judge Advocate acts in an independent, impartial capacity. He does not represent only the Government. In the preliminary investigating stage, he is an impartial adviser to both the Government and the accused. United States v DeAngelis, supra. True, in referring to one of his functions, namely, providing the pretrial advice to the convening authority under Article 34(a), 10 USC § 834, we drew a "loose" analogy between him and a prosecuting attorney (United States v Hayes, 7 USCMA 477, 480, 22 CMR 267), but in other respects he is entirely different. In the exercise of these separate functions the Staff Judge Advocate must use his intelligence and experience to keep from becoming at one stage of the proceedings so personally involved in the outcome as to preclude him from acting in a later stage. United States v Turner, 7 USCMA 38, 21 CMR 164; United States v Haimson, 5 USCMA 208, 17 CMR 208.

We have no fear that the Staff Judge Advocate will be inundated by hordes of suspected accused seeking him out for

---

[1] General orders of the Department of the Air Force, of which we can take judicial notice, do not show such certification. United States v DeMaria, 6 USCMA 585, 20 CMR 301.

advice as to their rights during the investigative proceedings by law enforcement officers; nor do we fear that by giving the accused advice as to his rights the Staff Judge Advocate will compromise his position as legal adviser to the convening authority, at least no more so than when he is asked to advise the investigating officer. United States v DeAngelis, supra. It seems to us to be a relatively simple matter to advise an uninformed and unknowing accused that, while he has no right to appointed military counsel, he does have a right to obtain legal advice and a right to have his counsel present with him during an interrogation by a law enforcement agent.

Turning to the effect of the errors, we hold that they constitute a denial of the accused's right to ■■■■ ■ counsel. Of course, the Staff Judge Advocate was not bound to assign military counsel to the accused. However, he was obligated to give him correct advice. Had he given the accused such advice the accused would have known that he had a right to have his counsel present during his interrogation. This advice was not given to the accused. Instead, he was told that he could receive no advice from anyone in the Staff Judge Advocate's office. True, the Staff Judge Advocate did not himself misadvise the accused as to his right to consult with him in regard to his rights in the criminal investigation. However, he had ordered the members of his staff to refuse to advise the accused on pain of having their "heads . . . roll." Consequently, the advice given to the accused by Lieutenant King, in specific compliance with the Staff Judge Advocate's order, was as much the advice of the Staff Judge Advocate as though he had personally given it to the accused. As a result of his inability to obtain advice as to his rights, the accused was forced to submit to questioning by the agent without a lawyer. A great deal is made of the fact that, had he desired, the accused could readily have obtained civilian counsel. This argument disregards the crucial circumstance that, because of the order of the highest legal authority on the post, no one in the Staff Judge Advocate's office informed the accused of his right to have a lawyer of his own selection present to aid him during the questioning by the police officer. That is the crux of the error in this case. That is all that we now hold.

In two of the three opinions in the recent case of In re Groban, 352 US 330, 1 L ed 2d 376, 77 S Ct 510, six of the nine justices of the United States Supreme Court clearly held that the requirements of due process are violated if a person suspected of a crime is deprived of the assistance of his own counsel at a "secret inquisition" by law enforcement agents. Concurring opinions, Judges Frankfurter and Harlan, ibid. page 335, and dissenting opinions of Chief Justice Warren and Justices Black, Douglas, and Brennan. For the reasons expressed in those opinions, we conclude that the accused was prejudiced by the conduct of the agents of the Office of Special Investigations. It is apparent, however, that the prejudice exists only as to the Additional Charge which arose out of the investigation. See United States v Best, 6 USCMA 39, 19 CMR 165. Accordingly, the findings of guilty as to that charge are set aside and ordered dismissed. This disposition of the charge makes it unnecessary for us to consider whether the accused's denials of criminality constitute a violation of Article 107, Uniform Code of Military Justice, 10 USC § 907. United States v Price, 7 USCMA 590, 23 CMR 54.

The record of trial is returned to The Judge Advocate General of the Air Force for submission to a board of review for redetermination of an appropriate sentence on the basis of the remaining approved findings of guilty.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

The review in this case reached this Court without the accused contending he had been deprived of his right to counsel. That alleged error was noticed by us but remains unanswered for as I understand the present opinion it holds that an accused is entitled to a

dismissal of one offense because an assistant in the office of the staff judge advocate failed to advise him he could have a lawyer of his own selection present during a preliminary inquiry into his alleged criminal conduct.

I can only hope this is an ad hoc decision, for it contains a number of principles which make for bad law and difficult administration. At least I find certain concepts, either express or implied, with which I disagree, and upon which I therefore set forth my views: First, the Court saddles an unwarranted obligation on the legal departments of the Armed Services; second, the opinion announces the erroneous hypothesis that an accused is given the right or privilege of selecting any lawyer that he chooses; third, there is no legal duty resting on a staff judge advocate or his assistant during the investigative phase to advise a fellow-officer that he may employ civilian counsel; fourth, an accused is not entitled to appointed military counsel merely because he is a suspect; fifth, an accused's right to military counsel of his choice is not absolute; sixth, the omission on the part of the staff judge advocate, if any, is magnified out of all proportion to its importance, for the record does not suggest remotely that the accused was uninformed of his right to employ and consult with civilian counsel; and, seventh, prejudice to the accused did not result from any act of commission or omission on the part of the staff judge advocate.

Just by way of preface to my short statement of facts, I quote from an opinion which shows our prior view of the law. The Chief Judge in United States v Manuel, 3 USCMA 739, 14 CMR 157, had this to say:

". . . This confession was reduced to writing and signed by the accused. After a preliminary showing of its voluntariness, and of compliance with Article 31(*b*) of the Code, supra, 50 USC § 602, the confession was received in evidence over the accused's objection. This objection was rightly overruled because it was based on lack of opportunity by the accused to consult with counsel prior to his interrogation. See Anderson v. United States, 124 F 2d 58 (CA6th Cir)."

Of course, I appreciate that the two cases can be distinguished on their facts but as between the two this one has less merit for reversal.

Because the holding of the Court has been narrowed to a reversal of a specification for an alleged error of omission, many of the facts set out in the opinion are immaterial. I, therefore, believe it would be helpful in understanding my opposition to the principles announced for me to emphasize some of the facts and circumstances casting light on the controlling question now being considered. The accused was a major with some fifteen years military experience. He was not uninformed in the ways of the business world, and he had had at least one previous brush with criminal investigations. He was not arrested, confined, or restricted; and he was not taken by surprise when he learned that he was being investigated for the commission of a number of offenses. When he appeared before the investigator, the special agent advised him of the nature of the accusations against him and of his rights under Article 31, including his right to refuse to answer any questions. He thereupon informed the agent that he would make no statement until he could consult with, and be represented by, counsel. The special agent volunteered his belief that the accused was not entitled to counsel until charges were preferred but, nevertheless, he informed the accused that he could leave and obtain legal assistance. The accused went to the office of the staff judge advocate and talked to Lieutenant King, who had previously represented him. The Lieutenant informed the accused that he had been forbidden to advise him, whereupon the latter returned to the office of the special agent. At that time, he was again advised that he need not answer any questions, and he well understood his rights for the record is replete with questions which he refused to answer. In all but three or four isolated instances he gave as his reasons for re-

fusing to reply, his privilege to refrain from answering. His principal mistake and the one by which he now profits was that his privilege not to testify was temporarily abandoned. Apparently as questions were being propounded and answers refused, the agent reached one area where the accused concluded he might benefit by responding. He, thereupon, elected to answer but, unfortunately for him, he lied. Beyond all question of doubt, he understood his choice to remain silent and his election to talk was not influenced by any failure to understand his rights or privileges. Moreover, there is not a scintilla of evidence in this record that the accused was induced, coerced, compelled, or misled into making any admission. His answers were freely and voluntarily given, and his failure to be advised by counsel did not result in a misunderstanding of his rights. He is merely the victim of his own folly.

The board of review in a fully and carefully developed opinion covers the original contentions of the accused. It is unmentioned and not followed by the Court, but I commend it to those readers who may be interested in determining its logic.